PERKINS, et al. *v.* MORGAN, et ux.

Division B.   Dec. 18, 1950.

No. 37728 (49 So. (2d) 383)

Ben Stevens, J. H. Stevens, and E. J. Currie, for appellants.

E. C. Fishel, for appellees.

Alexander, J.

Bill was filed by Morgan to set aside certain mineral deeds purportedly executed by him and his wife to Perkins, and by the latter to McCaffrey. The ground for rescission is that signatures thereto were forged. Supplemental relief was also asked. Perkins and McCaffrey appeal from a decree awarding the relief prayed for.

In October 1944, the Morgans executed a mineral lease, covering the lands in suit, to Hunt Oil Company. It is alleged that at the same time they executed to Perkins a mineral deed and royalty transfer of a one-fourth interest in all minerals. Thereafter, Perkins sold a one-eighth mineral interest to Edmondson, and a like interest to appellant, McCaffrey.

The gist of the action is that the signatures of appellees on the mineral deed to Perkins are forgeries. While fraud is asserted, it is clear throughout the record that such fraud is only such as is implicit in forgery. This is to say, not that the deed or the signatures thereto were procured by trickery and fraud, but that they were not procured at all.

Morgan testified that the lease was properly executed in favor of Hunt Oil Company; that it was procured by Perkins and the consideration was one dollar per acre, or $180; that he did not agree to sell the minerals; that there were then present, his wife and daughter, and both appellants. He denies that he executed a mineral deed then or at any time, but admits that Perkins requested him to do so. His wife corroborated this testimony in its substantial phases, as did also her daughter, who, it is alleged, was present.

Perkins testified that he came to the Morgan home in October 1944, at which time he was buying mineral leases and royalty interests; that Morgan told him a former lease at twenty-five cents an acre had expired and he wanted fifty cents an acre; that after discussion, it was agreed that Morgan would execute a lease and a deed to a one-fourth royalty interest for one dollar per acre; that this was done and Morgan explained that he needed money to pay his taxes. Payment by draft was there made. The lease had been previously prepared upon a typewriter, but the royalty transfer was prepared on the spot by filling in the blanks of a printed form in ink. The latter instrument purports to have been witnessed by Mrs. M. Tatham and J. L. McCaffrey, appellant. He denies any forgery and states that the signatures of the appellees are genuine.

Two officers of different banks testified that the signatures on the mineral deed to Perkins were the same as those, admittedly genuine, on the lease to Hunt Oil Company. At least one of them testified that the signatures on the deed could not have been traced, and that the bank would pay a check signed by such signatures. For com-

parison of signatures, a draft drawn payable to the Morgans in the sum of $540, and endorsed with their names, and so marked paid, was offered, and the appellees upon request signed their names before the court for further comparison.

Mrs. Tatham, who, it is claimed, signed as a subscribing witness the deed, testified that she did so on November, 2, 1944; that she was not present when the lease and deed were executed in October, but made a later trip to procure the acknowledgements by the Morgans.

A few contradictions may be examined in view of the steady light thrown thereon by appellants. Morgan states that Perkins brought and used a portable typewriter to prepare the lease at his home. Perkins denies this but states that he prepared it in anticipation of his visit. Morgan denies both that Mrs. Tatham was ever at his home and that he acknowledged the deed before her. All witnesses agree that the subscribing witness to the lease, one Morefield, was not present.

Mrs. Tatham did not assert that she was present when McCaffrey signed as subscribing witness to the deed, and despite the attestation thereon, they did not sign in each other's presence.

McCaffrey's testimony tracks that of Perkins and he states that both instruments were signed by the Morgans at the same time and that he was a subscribing witness to both. He did not see Mr. Tatham sign as witness to the deed. Mrs. Thaxton, a daughter of the Morgans, "did not think" the signatures on the two instruments were the same, and further testified that there was never any discussion regarding a mineral deed; that Perkins did make a later trip to the home, but came alone. Morgan had testified that whatever papers he signed he did so on the first trip of Perkins when the lease was executed.

The chancellor found that the instruments were not forged, and upon this point the oral and documentary evidence furnished ample support. There is no question as to the validity of the lease. The final decree set

aside the deed to Perkins on the ground of fraud in its procurement; upheld the subsequent deed from Perkins to Edmondson as having been made to a bona fide purchaser; and cancelled the deed from Perkins to McCaffrey as having been made to one not a purchaser in good faith, and a second deed from Perkins to Edmondson. As to the last named transaction, it would be immaterial to Edmondson whether it was upheld or not, if the first deed to him be upheld. We do not review this finding since the appeal does not attack the first deed to Edmondson, and the latter does not cross-appeal as to the cancellation of his second deed, though there is a vague reference in the brief for appellee of a cross-appeal and assignment of errors. There is involved, therefore, only the validity of the deed to Perkins, since, if it be valid, his deed to McCaffrey would likewise be good.

Our task is complicated by the clash of the two principles (1) that fraud must be proved by clear and convincing evidence; and (2) the decree of the chancellor must be upheld unless upon the record it is manifestly wrong. Other considerations add weight to the problem. In the first place, ██ ██ it is immaterial to the validity of the deed as such, who signed as subscribing witnesses or whether they signed at all. Secondly, may one who denies that he signed an instrument be heard to say in the same breath that his signature was procured by fraud?

Appellees do not contend that there was any misrepresentation or deception, or that they signed under any misapprehension. They stand upon their denial that they signed at all. Now, since the chancellor found that they did sign the deed, their evidence loses at least such weight as may be attributable to faulty memory. Their denial of their signatures upon a draft in their favor in the sum of $540 is significant. The draft was properly cleared and paid upon signatures which are obviously genuine, yet which they now repudiate.

We do not assert that one may not deny a signature and yet claim that if genuine it was procured by deliber-

ate misrepresentation of an existing material fact upon which he relied to his hurt. In Lee. v. State, 203 Miss. 264, 34 So. (2d) 736, it was held that an accused may, in spite of his denial that he signed a confession, seek to prove that it was procured by duress or other vitiating procedures.

Yet, here the target of appellees' attack is the fact of a forgery. Under the decree, we accept the fact that the appellees signed the deed. It was delivered. What testimony supports the assertion of fraud? Such fraud as would be imported into the case by proven forgery is now dissipated. They did sign and deliver the deed, and whether the subscribing witnesses were discredited by the trial judge is immaterial. The most that could be distilled from the contradictions is a plausible contention that the testimony regarding the attestation was inadequate, from which point reasoning may proceed to taint all the testimony of such witnesses as to the issue of signing and delivery upon the theory of *falsus in uno, falsus in omnibus*. But this brings us back to the fact, now established, that the deed was executed by appellees.

Fraud must henceforth be predicated upon a finding that the execution by appellees was procured by misrepresentation or fraud. There is left no testimony to support such a finding. It is not enough to speculate that such could have been the case or to piece out a case outside the record from an alleged inadequacy of price or an improvident bargain. Appellants executed the deed and there is no showing why they did it.

There are sume imponderables which haunt the record and invest it with odors which, though elusive, are sensible and pronounced. The draft upon the Hunt Oil Company payable to appellees in the sum of $540 was dated the same day the lease was acknowledged. Although the appellees testify without contradiction that they did not receive the proceeds, the draft was endorsed by them. Even a failing memory would seem to be alive to the impact of so substantial a sum into one's hands, yet the place for this eccentric piece in the jig-saw pattern of

the testimony is not readily identified. It was endorsed also by one Morefield who was a subscribing witness to the lease, and who, for reasons undisclosed, did not testify, and although the draft bore a notation that it was given for the lease in question, all that the Morgans received, so far as the record reveals, was $180. The consideration recited in the lease was ten dollars, and the annual delay rentals were fixed at one dollar per acre, or $180. The deed was written in three colors of ink. This many have been either friendly collaboration or designing conspiracy, yet it is quite improbable that it was signed before it was prepared.

Although these considerations concern chiefly the lease which is conceded to be good, it is an unfortunate and distracting incident which may well lead to a suspicion of irregularity those susceptible to even slight evidences of decomposition. The perceptions of counsel have reacted to these indications with zealous condemnation. The trial court rendered its decree under such stimulus. In cases of fraud, it is not enough that ''something is rotten.'' The test is not olfactory; a trial may be scented but it must lead to a definite quarry. As stated, when forgery was taken from the case, it carried with it all that was obnoxious. An indefinable aura may yet remain, but since it is indefinable it has insufficient substance to support the burden of showing actual fraud.

The bill of complaint sets out no acts of fraud in pais, and, had it done so, such fraud was provable only by clear and convincing testimony. The mists which enshroud the case may have been offensive, but they obscure all detail.

The decree of the learned chancellor is reversed and the deed from appellees to Perkins is ratified and confirmed, from which it follows that the deed from Perkins to McCaffrey is likewise confirmed and validated. There being no appeal from the decree insofar as the validation of the lease from appellees to Hunt Oil Company and of the deed or transfer from Perkins and Edmondson is concerned, we make no finding thereon. That part of

the decree adjudicating the respective rights of the parties to impounded and future rentals is set aside, such proceeds to be distributed in accordance with our conclusions herein.

Reversed and decree for appellants.